## PEOPLE *v.* COMSTOCK.

1. BANKING LAW—VIOLATION—SPECIFIC INTENT—PROOF.

Section 58 of the general banking law (3 How. Stat. § 3208*a et seq.*) provides that "every president, director, cashier, treasurer, teller, clerk, or agent of any bank, who, * * * without authority of the directors, * * * draws any order or bill of exchange * * * with intent * * * to injure or defraud the bank, * * * and any person who, with like intent, aids or abets any officer, clerk, or agent, in violation of this section, * * * upon conviction thereof, shall be imprisoned * * * not to exceed 20 years." *Held,* that the offense defined involves a specific intent to injure or defraud the bank; an intent not necessarily deducible from the fact that an agent of a bank, without authority from the directors, drew an order in favor of a patron to whom credit had, to the agent's knowledge, already been extended beyond the legal limit.

2. SAME—GENERAL PROVISIONS—CONSTRUCTION.

*It seems* that section 18 of the act (3 How. Stat. § 3208*b*7), providing for the punishment of all who knowingly aid or assist in a violation of any of its provisions, is designed to provide a punishment for all offenders, principals as well as aiders and abettors, except such as are within other sections of the act which themselves prescribe the punishment for specific offenses.

Exceptions before judgment from Mason; McMahon, J. Submitted November 5, 1897. Decided December 15, 1897.

Chester W. Comstock was convicted of violating the banking law. Reversed.

*Frank Dumon* (*M. L. Dunham* and *Gilbert H. Blodgett,* of counsel), for appellant.

*Fred A. Maynard,* Attorney General, and *A. B. Cogger,* Prosecuting Attorney, for the people.

115 MICH.—20.

HOOKER, J. The defendant was convicted upon a charge
that he had violated section 58 of the general banking law,
being 3 How. Stat. § 3208*f*7, which reads as follows:

"SEC. 58. Every president, director, cashier, treasurer,
teller, clerk, or agent of any bank, who embezzles, ab-
stracts, or willfully misapplies any of the moneys, funds,
credits, or property of the bank, whether owned by it or
held in trust, or who, without authority of the directors,
issues or puts forth any certificate of deposit, draws any
order or bill of exchange, makes any acceptance, assigns
any note, bond, draft, bill of exchange, mortgage, judg-
ment, or decree, or who makes any false entry in any book,
report, or statement of the bank, with intent in either case
to injure or defraud the bank, or any company, corpora-
tion, or person, or to deceive any officer of the bank, or any
agent appointed to examine the affairs of such bank, and
any person who, with like intent, aids or abets any officer,
clerk, or agent, in violation of this section, or who shall
issue or cause to be issued, or put in circulation, any bill,
note, or other evidence of debt to circulate as money, upon
conviction thereof, shall be imprisoned in the state prison
or in the state house of correction and reformatory at
Ionia, not to exceed 20 years."

The information contains five counts, but only the last
three were relied upon at the trial. In each of these the
defendant is charged with having, on the 22d day of Octo-
ber, 1896, while acting as clerk, agent, and manager of
the Mecosta County Savings Bank, drawn an order or bill
of exchange with intent to injure and defraud said bank.
The defendant stood mute, and a plea of not guilty was
entered by direction of the court.

At the time of this transaction, D. F. Comstock,
defendant's father, was a large stockholder, and presi-
dent, of the bank. On October 23, 1896, an acceptance of
D. F. Comstock & Co. for $2,000 was to fall due, and on
the evening of October 22d the defendant drew and for-
warded to the holder a draft upon the Hanover National
Bank of New York to pay said acceptance. The senior
Comstock was at this time a debtor to the Mecosta Bank
in an amount largely beyond the lawful limit, and, it
appearing that the draft was drawn and mailed without

the express authority of the board of directors, the judge
submitted to the jury only the question of defendant's
intent to injure and defraud the bank, which specific
intent they were told must be proved to the exclusion of
a reasonable doubt, to warrant a conviction.   The defend-
ant testified that he intended to charge the draft to his
father's account, or to the account of D. F. Comstock &
Co., which was apparently equivalent thereto, and that
he believed that his father was able to and would pay it,
and that he had no thought that the bank would lose a
dollar by the transaction.   In other words, he gave testi-
mony tending to prove that when he drew the paper he
harbored no design to cause the bank pecuniary loss, or
to injure or defraud it in any way; and it is urged that, if
this was true, he should not have been convicted.

Section 52 of the law provides that the total liabilities
of any person to the bank shall not at any time exceed 10
per cent. of its capital, and it seems to have been the
theory of the prosecution that the intentional extension of
credit beyond the limit necessarily involved an intent to
injure and defraud the bank.   The learned circuit judge
who tried the case does not seem to have assented to this
view of the law, for, while he said to the jury that there
was no dispute about the drawing of the order without the
consent of the directors to pay an acceptance of D. F.
Comstock & Co., he left to the jury the question of the
defendant's intent, which he need not have done if the
legal inference of an intent to injure and defraud the
bank necessarily follows the extension of credit.   Again,
in defining these words, he said:

"I suppose it is not necessary, gentlemen, for me to
define in this case, with any more particularity than their
common meaning gives, the words 'injure and defraud.'
Certainly these words are used in this statute, I think,
largely in their popular meaning, and of course to injure
a bank ordinarily would be to depreciate or destroy,
squander or dissipate, some of its property or assets."

His dissent from this proposition is also implied by the

following quotation, in which he gives prominence to the withdrawal of the fund without putting an equivalent into the bank:

"For the purposes of this case it is sufficient to say that the drawing of this order upon the Hanover National Bank of New York *without putting into the bank an equivalent therefor*, and without the authority of its board of directors, constituted an injury and a fraud upon the bank. There is no doubt about that. Therefore no time need be spent in determining nice discriminations as to the exact meaning of these words 'to injure and defraud.'"

This was followed by instructions to the jury concerning the inferences that they were authorized to draw from the circumstances, and the application of the rule that a man may be presumed to intend the natural and necessary consequences of his acts. He proceeded:

"And so, in this case, if the offense here which is charged against Chester W. Comstock was the result of misapprehension or accident, of course he is excusable; but, if he intentionally, purposely, and knowingly drew this order, *and intended to deprive the bank of $2,000 of its assets, and without consideration*, and without the authority of the bank or its directors, he is guilty as charged in this information. The intent would be presumed from the conscious, purposeful performance of such an unlawful action. In other words, sometimes the act determines the intent, and the jury is justified in inferring an intent. The purpose which a man entertains in his mind secretly and privately cannot often be proven by open, overt testimony. These intentions and purposes are not something upon which you can put your finger, which you can weigh and measure, define and locate, as you can some physical object. They must be inferred from circumstances; and in this case the only way you have of determining the intent of Chester W. Comstock is to examine all the surroundings,—examine what he did, and under what circumstances he acted, with what knowledge he acted,—and determine the question of his intent. Wrongful acts, intentionally committed,—wrongful in law or in fact,—imply the wrongful intent which they indicate, and if the defendant knowingly and purposely drew this draft to pay the debt of D. F. Comstock & Co.,

intending to appropriate the funds of the bank to that purpose, without the consent of its directors, and without any authority in law or in fact, it would constitute an injury upon this bank, and the defendant is guilty as charged."

So far it would perhaps appear that the court intended the jury to understand that drawing the draft with an intention to pay D. F. Comstock's acceptance at the expense of the bank was necessary to a conviction (though the last quotation may possibly be open to another construction), but from what follows we are of the opinion that the judge lost sight of this feature, and inadvertently laid down a different rule. The charge continued as follows:

"The defendant here has testified that he intended to charge the amount of this draft to D. F. Comstock & Co. on the books of the bank. It appears in evidence here, gentlemen, that D. F. Comstock was D. F. Comstock & Co.; that he owned all of its stock and assets; that its account upon the books of the bank was not kept separate from his own; that it was kept in with his account. It does not appear, unless from an inspection of the papers which have not been read in evidence, what the amount of indebtedness of D. F. Comstock & Co., if any, was to this bank. I feel constrained to charge you that, if the defendant entertained the intent to charge this $2,000 to D. F. Comstock's account at the time he drew the draft, it would constitute no defense in this case. The statute of the State provides that the liability of no person to any bank organized under the act shall exceed 10 per cent. of its capital stock and reserve. The capital stock of this bank was $50,000. And D. F. Comstock, upon the showing here, was indebted to the bank in a greater sum than its entire capital stock. For the defendant to have charged this $2,000 to D. F. Comstock upon the books of the bank, and add that amount to his liabilities, which were already in excess of the amount authorized by law, would have been another unlawful act on his part, if the first was one, —which I do not assume. He had no right to do that, and I am unable to see that an intention to perform one unlawful act would excuse another."

Look at it as we may, we are unable to avoid the conclusion that it supports the proposition of the people's

counsel, viz., that the intentional undue extension of credit was a legal fraud, and that it was criminal, whether the defendant designed or believed that the bank would be a loser in the transaction or not. In substance, it says that, although the defendant should have believed that he was protecting the bank, the law will conclusively presume that he intended to injure and defraud the bank. In other words (as an abstract proposition), the specific intent, made an element of the offense by law, is necessarily implied from an act which may have been intended to benefit the bank. This was plainly injurious to the defendant, unless the prosecution is right in its claim. This depends upon the construction to be given to the statute, and the meaning of the words "injure and defraud the bank." If we take these words to mean only a material hurt or loss to the bank, in the sense that a loss of a portion of its funds would be a hurt or loss,—as the first quotation would indicate to have been the view of the trial court,—the last quotation cannot be sustained. If, on the other hand, we can say that any infraction of the banking law is a fraud upon and injury to the bank, *within this section*, there was no error in this charge in this particular.

In determining this question, we may profitably examine other portions of the statute, and see what other acts would be subject to the same charge of fraud, and punishable under this section. In the first place, this section enumerates many, if not most, of the important functions of the officers of the bank, and makes them criminal, if done with the specific intent, and without authority of the board. It is significant that many of these are by other sections prohibited and made criminal, and punishable to a lesser extent, without mention of the intent. The very element which is said to make the issue of this draft unlawful, viz., the undue extension of credit, is introduced by section 52, where the amount of indebtedness of individual debtors to the bank is restricted. Section 19 punishes the certification of a check when the

drawer has not the requisite credit, and section 18 provides for the punishment of all who knowingly aid or assist in a violation of any of the provisions of the act. Section 52 does not make the undue extension of credit an offense, and, if it is punishable, it is under section 18 or 58. If section 18 is to be so technically construed as to apply only to aiders and abettors, and not to the principal actor, then the cashier who, unaided by any one, extends such credit, cannot be punished under that section, and, if punishable at all, it must be under section 58; but in that case, while he could be punished for extending such credit if he issued a draft to the debtor, he could pay him the cash with impunity, for payment in cash is not included in the list of proscribed acts. So we must say that, if giving credit improperly is punishable at all where cash is paid, it must be under section 18; and, if it is not punishable under that section, we have the singular condition of an act being punishable when an obligation to pay cash is given by the officer, when, if he pays cash under similar circumstances, it is not punishable at all. Again, if section 18 is to receive the technical construction mentioned, we must either find that many of the prohibited acts are not punishable, or that only aiders and abettors are liable. It is, in our opinion, more reasonable to believe that section 18 was designed to punish all offenders under the act, except such as are within section 58, and possibly other sections, providing specific punishment for acts therein enumerated, if there are any such. It would follow that an intentional extension of credit beyond the limit is an act punishable under section 18, the intention to defraud not being an essential element. Section 58 was aimed at more heinous offenses, as its severe penalty clearly implies. The section is aimed at embezzlement and misapplication of funds, and the issue of enumerated instruments with specific intent to deceive, mislead, and cheat,—things that do not necessarily enter into an undue extension of credit, though such undue extension of credit may enter into them, in which case it is possible

that there may be a choice of remedies by the authorities.

It is argued that the general criminal intent evinced by the violation of section 52 is sufficient. In crimes of violence which do not involve a specific intent, the general intent is sufficient; as in murder, when the malice which will justify a conviction need not include a design to take life. But in burglary, where there must be an intent to commit a felony, and in larceny, where there must be an intent to deprive the owner of his property, the specific intent must appear, and, although the breaking or taking of personal property be unlawful, amounting possibly to a trespass, the offense is not made out if the specific intent be wanting; as when one broke and entered intending to commit a simple assault and battery. Voluntary intoxication may be a defense to persons charged with some offenses, where it is of a degree which enables a jury to say that the accused was incapable of forming the specific and requisite intent. Thus an assault and battery is not excused by voluntary drunkenness, but the more aggravated offenses depend upon the accompanying intent prescribed in each case, and anything that tends to show its absence is a defense. A man could not be convicted of assault with intent to murder if his design was shown to be merely to deprive his victim of an arm or leg, to cut off his ear, or put out an eye. In either of these cases it would be competent for the defendant to prove that his actual and only intent was another than that charged, although unlawful, and even criminal; and a charge that intent to commit rape might be found notwithstanding it was made clear that the offense, if completed, would have been no more than incest, upon the ground that the attempt to commit incest was an unlawful and criminal act, and therefore no excuse, would be error. The foregoing principles are fully supported by our own decisions. *Roberts* v. *People*, 19 Mich. 414; *People* v. *Sweeney*, 55 Mich. 586; *People* v. *Lilley*, 43 Mich. 521; *People* v. *Umlauf*, 88 Mich. 274. In *U. S.* v. *Harper*, 33 Fed. 482, it is said that the law may presume an act to have been

done with a design to produce the necessary and natural consequences of such an act; but this language is qualified by the following:

"I do not wish to be understood as meaning that the intent to injure or defraud is conclusively established by simple proof of the doing of the prohibited act which results in injury. What I mean is this: That when the prohibited act is knowingly and intentionally done, and its natural and legitimate consequence is to produce injury to the association, or benefit to the wrong-doer, the intent to injure or defraud is thereby sufficiently established to cast on the accused the burden of showing that his purpose was lawful, and his act legitimate."

See, also, *U. S.* v. *Allen*, 47 Fed. 696.

In most, if not all, of the cases cited by counsel for the people, the question of intent to injure and defraud is recognized as involving a design to do material injury to the bank, as contradistinguished from a design to do an act prohibited by law, which, so far from being necessarily injurious, in fact may result in pecuniary gain to the bank. *Coffin* v. *U. S.*, 162 U. S. 674. The evidence raised a question for the jury, but the defendant was entitled to the benefit of the claim of good faith, to the extent of having it considered by the jury upon the essential element of intent to injure and defraud.

The further point is made that the information does not describe the offense with sufficient particularity. It follows the language of the statute, and a copy of the draft is included, which we think sufficient to apprise the defendant of the charge made against him. The following cases cited by counsel for the people are in point: *People* v. *Van Alstine*, 57 Mich. 69; *People* v. *Taylor*, 96 Mich. 576; *People* v. *Kennedy*, 105 Mich. 77; *People* v. *Frey*, 112 Mich. 251; *People* v. *Hanaw*, 107 Mich. 339.

We are constrained to set aside the verdict, and direct a new trial. It will be so ordered.

The other Justices concurred.